[No. B163970. Second Dist., Div. Four. Dec. 4, 2003.]

MANOUCHEHR GALDJIE, Plaintiff and Respondent, v.
BARBARA KRAMAR DARWISH et al., Defendants and Appellants.

**COUNSEL**

Green & Marker, G. Richard Green and Bo Thoreen for Plaintiff and Respondent.

Ezer Williamson & Brown and Mitchel J. Ezer for Defendants and Appellants.

**OPINION**

**CURRY, J.**—Appellants Barbara and David Darwish appeal from a judgment awarding specific performance to respondent Manouchehr Galdjie on a real estate agreement between respondent and the Barbara Kramer Darwish and David Darwish Revocable Living Trust (the Trust). Appellants contend that

the agreement was automatically discharged when neither party performed concurrent obligations on the date specified in the escrow instructions and that respondent pursued the wrong parties by naming appellants as individuals in the complaint rather than in their capacity as trustees for the Trust. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Purchase Agreement and Escrow Instructions*

On February 5, 1998, respondent, acting as his own real estate agent, submitted a purchase offer on an apartment building located on Yale Street in Santa Monica. Barbara Darwish signed a counteroffer that same date, raising the price somewhat and adding additional conditions. The "Darwish Trust" was identified as the seller. Respondent accepted the counteroffer on February 7.

In accordance with the agreement, respondent put $10,000 down. At the time of closing, he was to pay an additional $66,000 and obtain a loan for the remaining balance of $304,000. Within 10 days of the acceptance of the offer, respondent was to "provide to Seller a letter from lender stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified for the [loan] indicated above" and the seller was to deliver to respondent a termite report and certain other documentation. The agreement contained terms that stated "Time is of the essence" and "This agreement may not be extended, amended, modified, altered, or changed in any respect whatsoever except in writing signed by Buyer and Seller."

According to the escrow instructions executed on February 18, 1998, the sellers of the property were appellants, acting as trustees of the Trust. The sale was to close on April 9, 1998. The escrow instructions contained a provision which stated: "In the event that conditions of this escrow have not been complied with at the expiration of the time provided for herein, you are instructed, nevertheless, to complete the same at any time thereafter as soon as the conditions (except as to time) have been complied with, unless any of the parties have made written demand for cancellation and/or return of money or documents."

On April 1, 1998, in connection with faxing respondent some information needed by a prospective lender, Barbara Darwish wrote a note addressed to respondent stating that the contract would not be extended beyond April 9, "the date everything should be wrapped up." A handwritten note dated May 11, 1998, addressed to the escrow holder and signed by Barbara Darwish requested that escrow be "closed" due to respondent "not closing this escrow

on time." On May 12, 1998, appellants both signed instructions requesting cancellation of escrow, which were faxed to the escrow holder. Also on May 12, respondent obtained a commitment letter from Washington Mutual for a loan in the amount of $279,000. One of the loan conditions was "receipt and approval of a complete copy of the termite report per the purchase contract."

### Evidence at Trial

The matter was tried to the court. Respondent testified that he first attempted to obtain a loan on March 10. He spoke with Barbara Darwish frequently after the escrow instructions were signed and informed her that he was having trouble getting a loan. She told him they would continue until he got the loan and encouraged him to go forward. Respondents discussed the absence of a termite report both with Barbara Darwish and with the seller's agent, Suzanne Cole. The termite report was needed to fund the loan, but not to obtain the commitment letter.

According to respondent, on April 1, during a telephone conversation about a possible loan, Barbara Darwish orally agreed to extend escrow. Respondent first heard about appellants' attempt to cancel escrow on the day he finally received a loan commitment letter, May 12. A few days earlier, he informed Barbara Darwish that he had received a loan commitment letter.[1] She said that was fine. Respondent believed the loan could have funded within three days. He did not understand why appellants would cancel after the commitment was obtained because the deal could have closed within a short period of time.

Vincent Lupo, a loan officer for Washington Mutual, issued the loan commitment letter to respondent. The loan was for two-thirds of the purchase price. Lupo testified that the lack of a termite report was the only thing that prevented the lender from drawing up loan documents. There were eight other "conditions" set forth in the commitment letter, but the other conditions had to do with documents and information that had to be signed or received at closing

Suzanne Cole testified that she had not seen a termite report prior to being informed that escrow was cancelled. Afterward, Barbara Darwish gave her some documents and intimated that Cole should say they had been in her file the whole time. At some point, Barbara Darwish told her they were going ahead with the deal even though it did not close on time.

---

[1] Although the loan commitment amount in the letter was less than the amount specified in the agreement, respondent testified that at the time escrow was opened he had sufficient funds available for a 20 to 30 percent down payment or more.

Barbara Darwish testified that the current owner of the property is the "Yale Trust," and in February 1998, the owner was the Trust. She did not cancel the agreement after the 10-day contingency to obtain a loan commitment passed because she decided to give respondent more time and to work with him. She obtained a termite report on February 14, 1998, and mailed a copy to respondent. She spoke to respondent frequently, sending him whatever information he requested between the date escrow opened and April 1. On April 1, she sent the note to respondent indicating that escrow would not be extended. They did not communicate between April 1 and May 11, when she sent the note to the escrow holder, attempting to cancel escrow.

*Trial Court's Findings*

The court ruled in favor of respondent and issued a judgment ordering "Barbara Kramer Darwish and David Darwish" to "specifically perform pursuant to the parties' written Real Estate Purchase Contract and Receipt of Deposit agreement, dated February 5, 1998, and . . . sell the Property . . . to [respondent] within ninety (90) days."

The court made specific factual findings, including that respondent began efforts to obtain a loan by March 1998; that there was no timely prequalification letter from a lender as required by the agreement; and that respondent was not declared to be in default at that time. Nor was respondent declared in default on April 9, despite Barbara Darwish's April 1 letter to him warning that the deal must be wrapped by that date. Therefore, the case turned on "what transpired between April 9, 1998, the closing date stated in the escrow instructions, and May 11–13, 1998, when [Barbara Darwish] requested that the escrow be closed, just as [respondent] was obtaining the loan."

According to the court's findings, the following transpired: "On May 12, 1998, [respondent] obtained a loan commitment letter from [a lender] for the Property. One of the items required by the lender prior to issuing the loan documents and funding the loan was receipt and approval of a complete copy of the termite report, pursuant to the Agreement. By this time, however, [appellants] had decided to close the escrow. On May 13, 1998, [Barbara Darwish] sent a hand-written memo dated May 11, 1998 to the escrow agent and to the seller's broker . . . stating that she was asking 'that this escrow be closed due to the buyer not closing this escrow on time.' " Between April 9 and "May 11–13" respondent and Barbara Darwish were in "constant communication" and respondent "advised [Barbara Darwish] of his efforts to obtain a loan." Barbara Darwish "communicated her approval of his efforts"; "agreed orally to extend escrow beyond April 9, 1998"; "told [respondent] to call the escrow company and have the escrow extended"; "as of May 8 . . . was still cooperating and encouraging [appellant] to go forward with the

transaction"; and "although [respondent] asked [Barbara Darwish] for the termite report several times, [she] never sent it to him, the lender, or the escrow company."

The court acknowledged that Barbara Darwish's testimony contradicted many of these findings, but the court did not find her testimony credible. To the contrary, the court specifically found that she had "a propensity to manufacture evidence after the fact for purposes of litigation." Specifically, the court pointed to the handwritten letter dated May 11, which "was not faxed until May 13."[2] The court also pointed to the attempt to influence Cole's testimony concerning the contents of the broker's files.

*Motion for New Trial*

After judgment was entered, appellants moved for a new trial. Appellants contended they were sued as individuals, but could not be individually liable since they were acting as trustees of the Trust. The court denied the motion because the issue was not raised at trial and because, although the judgment ordered appellants to transfer the property as individuals, their status as trustees gave them the power to effect a valid transfer. This appeal followed.

## DISCUSSION

Appellants raise two issues on appeal: (1) whether the failure of either party to perform as required on the scheduled closing date automatically discharged the parties' agreement; and (2) whether respondent's failure to name the Trust as defendant or to specify that appellants were being sued in their capacity as trustees means that the judgment is against the wrong parties and cannot be enforced.

### I

With respect to the contention that the parties' rights and responsibilities under the purchase agreement were automatically discharged after April 9, in *Pitt v. Mallalieu* (1948) 85 Cal.App.2d 77 [192 P.2d 24], the court set forth the general rule that applies when a real estate buyer fails to timely deposit the funds needed to complete a property purchase into escrow and the parties' contract specifies that time is of the essence: "[The buyer's] obligation to deposit the purchase price within [the specified time] and the provision that time is of the essence are as binding as the promise to convey the land. Failure to pay the money within the specified time deprives the vendee of his

---

[2] The court based this finding on the fax identification on the copy of the letter contained in the broker's file, which does not appear in our record.

right of action to enforce performance of the vendor who holds the privilege of terminating the agreement of sale. [Citations.] Upon his failure to make payment the vendee committed a breach, and no affirmative act by the vendor was necessary to terminate the vendee's right of enforcement." (*Id.* at p. 81.)

In addition, failure of the buyer to remove a lender approval contingency justifies cancellation on the part of the seller. (*Fogarty v. Saathoff* (1982) 128 Cal.App.3d 780 [180 Cal.Rptr. 484].) In *Fogarty*, the buyer was to place into escrow notification of loan approval and the sellers were to deposit a termite report and title insurance. Neither party fulfilled these contingencies. A week after the date specified in the escrow instructions for closure, the seller gave written notice of cancellation. In an action for specific performance, the trial court ruled in favor of the buyers, finding that "the buyers had the financial ability to complete the transaction within a reasonable time of [the specified date for closure]"; "the loans were held up due to lack of real estate appraisal by the [lender] which had backlog of property to appraise and was running about two weeks behind"; "the fact that the property was never appraised for loan purposes was 'through no fault of the [buyers]' "; and "when seller purported to cancel the escrow, she had not deposited into escrow either the termite report or the policy of title insurance called for in the purchase contract and escrow instructions and that seller's attempt to cancel the escrow constituted an anticipatory breach of the contract." (*Id.* at p. 784.)

The appellate court reversed, noting with respect to the termite report: "To hold that the obligation of the seller to furnish a termite report and clearance before the buyers had solidified the deal by eliminating the contingency would not accord with commercial reality. In the absence of an express provision to the contrary, it would be unreasonable to expect or require a seller to incur the expense of a termite inspection and report while the transaction was still contingent upon the buyer's obtaining a loan commitment for the great bulk of the purchase price. It must be concluded that the removal of the contingency by depositing into escrow a notice of the lender's approval of the loan application was a condition precedent to the seller's obligation to obtain a termite inspection and report. [Citation.] [¶] Thus, there was no impediment to seller's canceling the escrow . . . and the trial court's finding that constituted an anticipatory breach of the contract is contrary to law." (*Id.* at p. 787.) With respect to the trial court's additional findings that the real reason for canceling the escrow was the seller's "marital difficulties" and that "a reasonable time for the buyers to perform was 30 days from and after [the date specified for closure]," the appellate court stated that these findings were "immaterial" and "of no consequence" because "the escrow was cancelled according to its express terms . . . ." (*Ibid.*)

Like any other contractual terms, timeliness provisions are subject to waiver by the party for whose benefit they are made.[3] (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 767, p. 694 ["A condition may be *waived*; i.e., the party whose duty is *dependent* upon the other party's performance of a condition may make his duty *independent*, binding himself to perform unconditionally. [¶] . . . [¶] Thus, a buyer may waive conditions relating to time and place of delivery"].) Generally, in the context of a sale of real estate, waiver of timeliness provisions is found where the purchase is being made by installments, and the buyer is late making one or more payments. In *Williams Plumbing Co. v. Sinsley* (1975) 53 Cal.App.3d 1027 [126 Cal.Rptr. 345], for example, the contract called for payment in three installments, and time was specifically said to be of the essence. Shortly before the second installment was due, the parties discussed the buyer's proposal to obtain a loan and pay the remaining price that month rather than when the third installment was due. The day after the second installment was due, however, the seller threatened to call the deal off and keep the first installment. The buyer paid the second installment immediately and filed an action for specific performance. The appellate court concluded that the seller's "tacit approval" of the buyer's proposal to delay the second installment but pay the entire purchase price through a loan meant that there was no right to terminate the contract and that buyer was entitled to specific performance. (*Id.* at pp. 1032–1034.)

In *Gonzalez v. Hirose* (1948) 33 Cal.2d 213 [200 P.2d 793], the buyers made timely payments under a real estate installment sales contract for a while, but then there came a period when payments were sporadic. The original seller, a bank, accepted and credited late payments. When the bank's successor in interest tried to strictly enforce the timeliness provision, the court determined that it had been waived and needed to be clearly reinstated before it could be enforced: "The case before us plainly indicates that the purpose of the time and forfeiture clauses was merely to secure payment of the purchase price, that payment thereof would make the bank or its assignee whole; that since the time and the forfeiture clauses had been waived the [buyer] was entitled to a definite seasonable notice from the [assignee] of the reestablishment of those conditions with reasonable opportunity for compliance before the [assignee] could declare a forfeiture. . . . In the absence of the appropriate notice to comply with reestablished time conditions or of an offer by the [assignee] of a deed upon payment of the balance due, there was no breach of duty on the part of the [buyer]." (*Id.* at pp. 216–217.)

---

[3] There is also relief available from timeliness defaults that could result in forfeiture. (See, e.g., Civ. Code, § 3275; *MacFadden v. Walker* (1971) 5 Cal.3d 809, 813–814 [97 Cal.Rptr. 537, 488 P.2d 1353].) Forfeiture is not an issue here.

■ Applying this rule to the present case, the trial court found that Barbara Darwish waived the time provisions by continuing to deal with respondent after the dates specified in the contract. The court found that Barbara Darwish's statement in her April 1 letter that time would not be extended past April 9 was contradicted by her actions in staying in communication with respondent and approving and assisting his efforts to locate a willing lender. Thereafter, she did not reestablish time conditions by giving notice that the deal must close by a certain date. Instead, she simply cancelled escrow without informing respondent or the realtor just as respondent finally obtained a firm loan commitment.

Appellants do not dispute the trial court's factual findings. Their argument on appeal focuses on the case of *Pittman v. Canham* (1992) 2 Cal.App.4th 556 [3 Cal.Rptr.2d 340]. There, a licensed real estate broker entered into a contract with an elderly women to purchase her property for $250,000. Escrow was to close on December 24, 1987, and time was said to be of the essence. The date came and went, the seller did not tender the deed, and the broker did not tender a down payment, promissory note, and deed of trust as was his obligation. On March 21, the seller told the broker that the property was worth more. Several months later, she entered into a contract to sell the property to a third party for $600,000. The broker sued for specific performance. The trial court rejected the claim, finding that the seller had not waived time for performance, and that the broker defaulted when he failed to tender the purchase money, note, and deed of trust by December 24. The appellate court affirmed, stating that "the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure." (*Id.* at p. 559.) Instead, "[t]he failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform." (*Id.* at pp. 559–560.) Put another way, "where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged . . . [and] [n]either party can hold the other in default." (*Id.* at p. 560.)

Citing an outdated edition of Miller and Starr on California Real Estate, appellants contend that *Pittman* "jettisoned eighty years of case law" and created a new rule of automatic discharge. We do not read *Pittman* as having changed existing law in any remarkable fashion. Witkin states that "[i]n the ordinary contract for the sale of real property, delivery of the deed and payment of the purchase price or last installment thereon are concurrent conditions, and there must be performance or *tender* thereof by one party to put the other in default." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 737, p. 667.) Applying this rule to the facts set forth in *Pittman*, the broker neither delivered nor *tendered* the purchase price at any time. Consequently,

he had no basis for seeking specific performance or accusing the seller of breach for failing to deliver the deed.

It is true that Miller and Starr take the position that either performance or tender is required not just where a party intends to sue for breach or specific performance, but also where the party desires to cancel escrow instructions on the ground that the deal did not close in a timely fashion. They state in their current treatise: "A condition precedent must be satisfied prior to the creation of an enforceable contract, but with dependent concurrent conditions, there is a binding contract and the issue is the performance of the contract and whether one party who has not performed or tendered performance can terminate the contract, and the right of the other party to the benefits of the contract, merely because of the expiration of the time period provided in the contract. [¶] Even though time is expressly of the essence in the contract, the weight of authority holds that since the performance by each party is dependent upon the performance by the other party, the mere failure of one party or both parties to perform mutually dependent concurrent conditions within the time specified in the contract does not terminate the contract automatically." (1 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 1:162, p. 685, fn. omitted.)[4] In their view, *Pittman* is contrary to the "weight of authority" because of its holding that "when time is expressly of the essence, and the *provision has not been waived*, a party may terminate the contract upon the expiration of the time period provided in the contract without either performance or a tender of performance by the party terminating the contract." (*Id.* at pp. 635, 637, fns. omitted, italics added.)

Our review of the authorities reveals that California courts generally *do* strictly enforce time deadlines in real estate sales contracts, permitting the seller to cancel after the time specified where time is specifically made of the essence *unless* there has been a waiver or potential forfeiture. (*Pitt v. Mallalieu, supra,* 85 Cal.App.2d 77; *Fogarty v. Saathoff, supra,* 128 Cal.App.3d 780; *Major-Blakeney Corp. v. Jenkins* (1953) 121 Cal.App.2d 325, 331 [263 P.2d 655] [where purchase agreement made time of the essence and provided for cancellation upon failure of the buyer to deposit the final payment on or before January 1, 1950, "[the sellers] justifiably terminated [the buyer's] rights under the contract on January 6, 1950"]; *Nash v. Superior Court* (1978) 86 Cal.App.3d 690, 693, 697 [150 Cal.Rptr. 394], [where instructions stated " '[i]n the event escrow is not closed by [a specified date and time], escrow is to be immediately cancelled without any further

---

[4] In their reply brief, appellants quote an earlier edition of the treatise stating that "[t]he [*Pittman*] court's decision appears to be contrary to a long line of decisions . . . [holding that] the failure of both parties to perform or tender performance of concurrent conditions does *not* automatically terminate the contract; instead, either party has a *reasonable time* thereafter to perform or tender performance." (1 Miller & Starr, Cal. Real Estate (1999 supp.) § 1:135, pp. 194–195.)

instructions from any party and funds deposited herein by buyer are to be returned to buyer less all cancellation charges incurred herein,' " the duty to convey terminated on the date specified and buyer could not obtain specific performance] disapproved in part on another ground in *Malcolm v. Superior Court* (1981) 29 Cal.3d 518 [174 Cal.Rptr. 694, 629 P.2d 495].)

But regardless of whether *Pittman* represents a startling new development in the law, it does not support appellants' position here. The court in *Pittman* distinguished the case of *Chan v. Title Ins. & Trust Co.* (1952) 39 Cal.2d 253, 256 [246 P.2d 632] because "[t]here, the court found no default because time for performance had been waived" whereas in the case before the *Pittman* court "the trial court held that there has been *no waiver*, and there is nothing in the record that requires us to disturb that finding." (*Pittman v. Canham, supra,* 2 Cal.App.4th at p. 560, italics added.) The court in *Pittman* also distinguished the case of *Rubin v. Fuchs* (1969) 1 Cal.3d 50 [81 Cal.Rptr. 373, 459 P.2d 925], where the buyer promised to deposit cash and a purchase money deed of trust by a certain date and the seller promised to record a tract map. Because recordation of the tract map was needed to supply the legal description for the deed of trust, the court held that the seller, having failed to perform a necessary precedent, could not rescind or cancel due to the buyer's failure to perform his promise.

The situation before us is more analogous to that in the two cases distinguished by the court in *Pittman* than it is to the facts in *Pittman*. The plaintiff/broker in *Pittman* had no excuse for failing to at least tender performance, and no reason to believe that the time condition had been waived. Here, the trial court found that there was a waiver based on the communications between the parties. ■ The court further found that by the time appellants notified the escrowholder of their desire to cancel, respondent had tendered the loan approval letter and that respondent's failure to tender the loan funds was due to the seller's failure to put the termite report into escrow. Accordingly, *Pittman* is not controlling and affords no basis for overturning the trial court's judgment.

## II

### A

The complaint names "Barbara Kramar Darwish, an individual," and "David Darwish, an individual" as the only defendants. Appellants argue that the failure to name the Trust itself or to specify that they were being sued in their capacity as trustees of the Trust means that the complaint was brought against the wrong parties and that the judgment entered cannot bind the Trust.

Respondent contends this objection was waived because it was not raised until after the trial. It is true that "the objection of one sued individually that

he should have been sued in a representative capacity or also in a representative capacity can be waived." (*Sealite, Inc. v. Finster* (1957) 149 Cal.App.2d 612, 618 [309 P.2d 51].) But the problem as we see it is not merely that appellants might have been sued in the wrong capacity, and thereby incurred personal liability for damages where none was due. The judgment rendered was for specific performance requiring transfer of a property owned by the Trust. If the Trust was an indispensable party and was not properly brought into the lawsuit, the enforceability of the judgment may be in question. As explained in *King v. King* (1971) 22 Cal.App.3d 319, 326 [99 Cal.Rptr. 200], an indispensable party issue can be raised for the first time on appeal if the contention is that "the absence of a party has precluded the trial court from rendering any effective judgment between the parties before it." (*Id.* at p. 326.) In that situation, " '[t]he objection is not merely one of lack of jurisdiction of the person of the absent party; the court cannot even proceed to adjudicate the rights of the party before it because personal jurisdiction over an indispensable party is necessary for *jurisdiction of the subject matter.*' " (*Id.* at p. 327, quoting 3 Witkin, Cal. Procedure (2d ed. 1971) p. 1805.) Therefore, we must address the substantive question.

## B

To support their position that respondent was required to name the Trust or name them in their capacity as trustees, appellants cite section 18000 of the Probate Code, which provides that "a trustee is not personally liable on a contract properly entered into in the trustee's fiduciary capacity in the course of administration of the trust unless the trustee fails to reveal the trustee's representative capacity or identify the trust in the contract." Sections 18001 and 18002 go on to state that "[a] trustee is personally liable for obligations arising from ownership or control of trust property only if the trustee is personally at fault," and that "[a] trustee is personally liable for torts committed in the course of administration of the trust only if the trustee is personally at fault." Section 18004 further provides: "A claim based on a contract entered into by a trustee in the trustee's representative capacity, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administration of the trust may be asserted against the trust by proceeding against the trustee in the trustee's representative capacity, whether or not the trustee is personally liable on the claim."

An understanding of these provisions requires a brief review of common law as it relates to suits involving trusts and trustees. Unlike a corporation, a trust is not a legal entity. Legal title to property owned by a trust is held by the trustee, and common law viewed the trustee as the owner of the trust's property. The trustee had the power to enter into a contract with a third person when such power was expressly given to him or her by the trust

instrument or by the court or "when the making of the contract is reasonably necessary to the execution of the purposes of the trust and so impliedly authorized." (Bogert, Trusts & Trustees (2d ed. rev. 1982) § 711, p. 255.) When an authorized contract was breached, or when a tort was committed against the trust, the trustee was considered the holder of the chose in action with the right to bring suit. (See, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶ 2:126, p. 2-36 ["A probate or trust estate is not a legal entity; it is simply a collection of assets and liabilities. As such, it has no capacity to sue or be sued, or to defend an action. Any litigation must be maintained by, or against, the executor or administrator of the estate"]; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 460 [80 Cal.Rptr.2d 329] ["[G]enerally the trustee is the real party in interest with legal title to any cause of action on behalf of or in the name of the trust . . . ."]; *Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 427 [8 Cal.Rptr.2d 869] ["At common law, where a cause of action is prosecuted on behalf of an express trust, the trustee is the real party in interest because the trustee has legal title to the cause"].)

Similarly, where a tort was committed or a contract breached in the administration of trust duties, third parties were expected to sue the trustee individually, not in his or her representative capacity as trustee. As explained in Bogert's treatise on trust law: "Assuming that a contract made by a trustee is within his powers, express or implied, it is generally held that the trustee is personally liable upon such a contract. He can be sued upon it as an individual and not as a representative. It is not necessary to add the words 'as trustee' to his name as a defendant, and their use in such a way is surplusage. A judgment against him is collectible out of his individual assets and not out of the trust property. A suit against him 'as trustee' at law will not enable the plaintiff to collect from the trust estate. . . . The creditor upon the trustee's contract has no power to sue the beneficiary at law, or to pay himself by 'self-help' from trust property which the creditor may have in his hands." (Bogert, Trusts & Trustees, *supra*, § 712, pp. 258–264, fns. omitted; see *Vance v. Estate of Myers* (Alaska 1972) 494 P.2d 816, 818 ["The orthodox view, still adhered to in a great number of jurisdictions, is that the person to whom the trustee has incurred liability in the administration of the trust must bring an action against the trustee personally, but not in his representative capacity. The claimant may not reach the trust estate directly and apply it to the satisfaction of his claim"]; 3A Scott on Trusts (4th ed. 1988) § 266, pp. 462–463, fns. omitted ["In the case of a trustee, an action at law will not lie against him in his representative capacity. At common law the only judgment that a court of law can render against him is a personal judgment. . . . Where an action at law is brought against the defendant 'as trustee' and the trustee is personally liable, there is a difference of opinion on the question

whether the words 'as trustee' shall be treated as surplusage, with the result that the action proceeds and the plaintiff obtains a judgment against the defendant personally, or whether the action is to be treated as one against the trustee only in his representative capacity, with the result that the action will be dismissed"].)

The trustee who was subject to such liability as the result of performance of his or her duties could seek reimbursement from trust assets. (Bogert, Trusts & Trustees, *supra*, § 718, p. 312; see *Taylor v. Davis'* (1884) 110 U.S. 330, 335 [28 L.Ed. 163, 4 S.Ct. 147] ["When a trustee contracts as such, unless he is bound no one is bound, for he has no principal. The trust estate cannot promise; the contract is therefore the personal undertaking of the trustee. As a trustee holds the estate, although only with the power and for the purpose of managing it, he is personally bound by the contracts he makes as trustee, even when designating himself as such. The mere use by the promisor of the name of trustee or any other name of office or employment will not discharge him. Of course when a trustee acts in good faith for the benefit of the trust, he is entitled to indemnify himself for his engagements out of the estate in his hands, and for this purpose a credit for his expenditures will be allowed"].) From this circuitous procedure, a rule derived that "a person with whom a trustee makes a contract in the proper administration of the trust, and who cannot obtain satisfaction of his claim in an action at law against the trustee personally, is entitled to maintain a bill in equity against the trustee to reach the trust estate to the extent to which the trustee is entitled to exoneration out of the trust estate." (Scott on Trusts, *supra*, § 268, p. 468, fn. omitted; see Bogert, Trusts & Trustees, *supra*, § 716, p. 298, fn. omitted ["[I]f recovery at law against the trustee personally on an intra vires contract is impossible or extremely difficult, equity has been inclined to permit the contract creditor to sue the trustee in equity and obtain a decree for payment out of trust assets"]; c.f. *Johnston v. Long* (1947) 30 Cal.2d 54, 62 [181 P.2d 645] [citing the Restatement of Trusts and Scott for the proposition that "when the claim against the trustee is uncollectible because his personal assets are insufficient, the plaintiff may reach the trust assets to the extent that the trustee would have had a right of reimbursement" and noting that "[a] few cases have gone further and allowed the trustee to be [sued] in his representative capacity in order to avoid circuity of action"].)

An action for specific performance of a sales contract is an action in equity, and therefore, "[t]he difficulties that have bothered the courts where an action is brought against the trustee in his representative capacity for damages for breach of contract do not arise where the suit is one for specific performance of the contract." (Scott on Trusts, *supra*, § 272.1, p. 510.) In *Scheibeler v. Albee* (1906) 114 A.D. 146 [99 N.Y.S. 706], plaintiff brought suit against trustees and executors of an estate in their representative capacity seeking to enforce a promise to sell estate property or return of money paid toward the

purchase. The trial court sustained a demurrer on the ground that defendants "could not be sued in their representative capacity as trustees and executors, but, if liable at all, were liable as individuals, and not in their representative capacity." (*Id.* at p. 707.) The appellate court agreed that a claim for *damages* could not be sustained against defendants in the capacity as trustees, but reversed because "[t]he defendants having received the money in their representative capacity, an action can be maintained against them in that same capacity for its recovery." (*Ibid.*) In *Anselmo v. Franck* (1932) 109 N.J. Eq. 480 [158 A. 103], defendant entered into a contract to purchase property as a trustee. The seller brought suit against him individually for specific performance. The court held that the seller could not obtain specific performance against defendant as an individual where he had entered into the contract as a trustee.

A similar rule developed in cases involving breach of contract where the agreement between the third party and the trustee included an express exclusion of personal liability of the trustee. (Bogert, Trusts & Trustees, *supra*, § 712, p. 265.) In that situation, there was a presumption, at least in some courts, that the trustee had the "power to give the creditor a right to sue the trustee as trustee and to get satisfaction out of the trust assets." (*Id.*, § 715, p. 290, fn. omitted; see Scott on Trusts, *supra*, § 270, p. 489 ["There are some indications in the cases that even though a person to whom the trustee has incurred a liability in the administration of the trust would not otherwise be permitted to enforce the liability against the trust estate, he can do so where the settlor has manifested an intention that the trust estate should be subject to such liability"].)

Early on, California enacted former Civil Code section 2267, which provided: "A trustee is a general agent for the trust . . . . His acts, within the scope of his authority, bind the trust property to the same extent as the acts of an agent bind his principal." (Stats. 1872, repealed by Stats. 1986, ch. 820, § 7, p. 2730) The language of that provision was described as "not apt or clear" but it was apparently intended to "make the trustee in his representative capacity a juristic person in a court of law and to provide that he may be sued as such and the trust property . . . taken under a judgment recovered against him as trustee." (Bogert, Trusts & Trustees, *supra*, § 712, p. 268; see Rubin *Liability of the Trust Estate Arising Out of Trustee's Contracts With Third Persons* (1950) 2 Hastings L.J. 53, 65 ["The modern tendency is to make the trust estate responsible for contracts properly made by the trustee. The procedural difficulties have been largely removed by joinder of law and equity, and by statute. The substantive difficulties tend to disappear in the recognition of the trustee as a juristic person to whom direct attachment of liabilities is applied"].) The Montana Supreme Court, interpreting a nearly identical Montana statute, explained: "[A]lthough strictly speaking an agent must have a principal, and trust property not being a person, natural or

artificial, cannot be a principal, the meaning of the Act seems clear enough. Its effect must be either that the trust estate is to be considered an entity chargeable as a principal for the acts of the trustee, its agent, or that the legal incidents of the trustee's authorized acts, so far as the parties are concerned, are the same as those which would attach to an agent's authorized transaction for his principal." (*Tuttle v. Union Bank & Trust Co.* (1941) 112 Mont. 568 [119 P.2d 884, 888].)

Section 2267 of the Civil Code was cited by the California Supreme Court for the proposition that "[t]rust property is bound by the acts of the trustees within the scope of their authority," but those cases did not clarify whether or not the trustee remained individually liable. (*Irvine v. MacGregor* (1928) 203 Cal. 583, 586 [265 P. 218]; accord *Purdy v. Bank of America N.T. & S. Assn.* (1935) 2 Cal.2d 298, 301–302 [40 P.2d 481]; see *Tuttle v. Union Bank & Trust Co., supra*, 119 P.2d at p. 888 ["[W]here there are no intervening equities against the trustee personally in favor of either beneficiary or third party, that the trustee is not personally liable but . . . the remedy is an action against it as trustee, and that a judgment against it in that capacity is limited in its application to the trust estate"].)

Against this background, the Legislature repealed section 2267 of the Civil Code in 1986 and substituted sections 18000 and 18004 of the Probate Code to make clear that trustees would not be personally liable, and generally need not fear loss of their personal assets, when acting on behalf of a trust in dealing with third parties. (Stats. 1986, ch. 820, § 7, p. 2730.) The purpose behind the enactment of section 18000, as explained by the Law Revision Commission, is to "excuse[] the trustee from personal liability on a contract whether *either* the trustee's representative capacity *or* the identity of the trust is revealed in the contract" and to "reverse . . . the prior case-law rule in California that a trustee was personally liable on a contract unless the contract stipulated that the trustee was not liable." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 ed.) foll. § 18000, p. 236.) The comment to section 18004 states that it "alters the prior case law rule that the trustee could not be sued in a representative capacity where the trust estate was not liable." (*Id.*, foll. § 18004, p. 239.)

In a report supporting the enactment of the provisions, the Law Revision Commission discussed the problems faced by trustees and trust creditors under common law that would be alleviated by the statutes: "The common law viewed the trustee as the owner of the property and as a consequence liabilities arising out of ownership became the personal responsibility of the trustee. . . . The proposed law adopts the concept of personal fault drawn from the Uniform Probate Code. A trustee may be liable for obligations arising out of ownership of property only if the trustee personally was either intentional or negligent in acting or failing to act." (18 Cal. Law Rev. Com. Rep. (1986) pp. 588–589, fns. omitted.)

"If a contract or tort creditor is not paid, the creditor has historically been faced with the problem of determining whom to pursue and on what theory. Under traditional rules, a contract creditor could sue the trustee as an individual in an action at law, but the creditor could not resort to trust property for the satisfaction of the claim unless the contract so provided. Equity came to the rescue of creditors in situations where it was impossible or extremely difficult to collect against the trustee by permitting recovery by way of a creditor's suit out of trust assets in the amount of the trustee's right to indemnity. In many jurisdictions, the necessity of relying on an equitable action was eliminated by statutes permitting suit against the trustee in a representative capacity, or directly against the trust, resulting in collection against trust assets. [¶] The third person should not have to be concerned with source of the fund that will be used to pay the claim. The proposed law adopts this position. Hence, a third person with a claim against the trust or trustee may assert the claim against the trust by bringing an action against the trustee in the trustee's representative capacity. The question of ultimate liability as between the trust estate and the trustee may then be determined in the proceedings concerning the internal affairs of the trust or may be settled informally among the parties to the trust.[5] The proposed law thus continues the substance of existing law on reimbursement, but not the procedural rules of the common law that limited the right of creditors to pursue the trustee in a representative capacity." (18 Cal. Law Rev. Com. Rep., *supra*, at pp. 591–592, fns. omitted.)

The interaction of these provisions was discussed in *Haskett v. Villas at Desert Falls* (2001) 90 Cal.App.4th 864 [108 Cal.Rptr.2d 888], where the court concluded: "A trustee . . . cannot be held personally liable under section 18001 for any obligation arising from his ownership or control of trust property, nor can he be held personally liable under section 18002 for any torts committed in the course of his administration of the trust, unless the party seeking to impose such personal liability on the trustee demonstrates that the trustee *intentionally or negligently* acted or failed to act in a manner that establishes personal fault." (*Id.* at pp. 877–878.) In *Haskett*, a complaint had been filed by a trustee on behalf of a trust and was dismissed for failure to bring to trial within five years. Defendants sought attorney fees and an

---

[5] Probate Code section 18005 states that "[t]he question of liability as between the trust estate and the trustee personally may be determined in a [separate] proceeding . . . ." According to the Law Revision Commission Comment: "Under this section, ultimate liability as between the estate and the trustee need not be determined before the third person's claim can be satisfied. It is permissible, and may be preferable, for judgment to be entered against the trust without determining the trustee's ultimate liability until later. Where judgment is entered against the trustee individually, the question of the trustee's right to reimbursement may be settled informally with the beneficiaries or in a separate proceeding in the probate court." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code, *supra*, foll. § 18005, p. 240.)

award was entered against " 'Plaintiff Steven B. Haskett' . . . in his representative capacity as trustee." (*Id.* at p. 872.) Defendants sought a ruling that Haskett was personally liable for the fees. The appellate court concluded that they had not met their burden under sections 18001 and 18002 of proving intentional or negligent conduct. Defendants argued that section 18004 provided for a trustee's liability even in the absence of such evidence. The court held that since section 18004's words "plainly state that the enumerated types of claims 'may be asserted *against the trust* by proceeding against the trustee *in the trustee's representative capacity, whether or not the trustee is personally liable on the claim,*' " its language "plainly confers a right to proceed against the assets of the *trust*" and "does not confer an absolute right to proceed against the trustee's personal assets." (*Id.* at p. 880.)

■ From the above authorities it is clear that the proper procedure for one who wishes to ensure that trust property will be available to satisfy a judgment, whether for damages for breach of contract or for specific performance, should sue the trustee in his or her representative capacity. We do not believe, however, that this results in an ineffectual judgment due to the specific facts of the case before us. The judgment did not give respondent the right to attach property owned by appellants as individuals; it entitled him to receive a piece of real property owned by the Trust by obtaining appellants' signatures on a deed. ■ Courts have held that where a trustee signs a contract of sale or deed without reference to his or her representative capacity, the contract or deed is enforceable against the trust. (See, e.g., *Yates v. Hill* (R.I. 2000) 761 A.2d 677 [court permitted specific performance of a contract to sell real estate where the sole trustee of the trust that owned the property signed the contract as an individual]; *Oken v. Hammer* (Colo.Ct.App. 1990) 791 P.2d 9, 11, and cases cited therein ["[I]f the grantor of a deed has the power to sell, convey, or encumber property as trustee and has no personal interest in the property, then the deed will be construed as a legitimate exercise of the trustee power even though the instrument fails to reference the trust"]; but see *Rogaris v. Albert* (2000) 431 Mass. 833 [730 N.E.2d 869] [where trustee signed contract to sell real estate as an individual and made no mention of his role as trustee, trust was not bound].)

■ In a similar vein, a California court has held that a contract of sale signed by a beneficiary of a revocable inter vivos trust who held the power to direct the trustee to purchase or sell real estate was enforceable in an action for specific performance against the trust. (*Walgren v. Dolan* (1990) 226 Cal.App.3d 572, 578 [276 Cal.Rptr. 554].) ■ The court pointed out that a revocable inter vivos trust is a probate avoidance device, but does not prevent creditors of the settlors—who are often also the trustees and the sole beneficiaries during their lifetimes—from reaching trust property. (*Id.* at p. 578; see Prob. Code, §§ 18200–18201.)

██ The evidence before us establishes that the Trust is a revocable inter vivos trust, that appellants are the sole trustees and, that as beneficiaries, they have the power during their lifetimes to direct the sale of the real property owned by the trust. In view of the above authorities, their signatures as individuals on the title deed as required by the judgment entered herein is sufficient to convey good title from the Trust.

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), J., and Hastings, J., concurred.

A petition for a rehearing was denied December 23, 2003, and the opinion was modified to read as printed above.